Nos. 25-1718(L), 26-1278, 26-1307

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

FRANK HARMON BLACK; and
SOUTHEAST INVESTMENTS, N.C., INC.,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent,

and

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

Intervenor-Respondent.

---

On Petition for Review of Orders of the
Securities and Exchange Commission, No. 3-19185

---

# PETITIONERS' REPLY BRIEF

---

CAMERON HALLING
Cal. Bar No. 306778
Pacific Legal Foundation
555 Capitol Mall, Ste. 1290
Sacramento, CA 95814
Tel.: (916) 419-7111
Fax: (916) 419-7747
CHalling@pacificlegal.org

ADITYA DYNAR
D.C. Bar No. 1686163
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Tel.: (202) 807-4472
Fax: (916) 419-7747
ADynar@pacificlegal.org

## Table of Contents

Introduction .......... 1
Argument .......... 3
I. FINRA/SEC adjudication violates the Seventh Amendment .......... 3
II. FINRA/SEC adjudication violates Article III .......... 6
III. FINRA/SEC's adjudication structure violates the Fifth Amendment's Due Process Clause .......... 10
IV. FINRA/SEC's adjudication structure violates the nondelegation doctrine .......... 14
V. FINRA adjudicators are not properly appointed .......... 19
VI. Set aside of operative orders is an appropriate remedy .......... 24
VII. SEC orders should also be set aside because SEC erred in imposing penalties for failure to preserve a representative's wife's 16 personal emails .......... 24
VIII. Section 78y(c)(1) does not preclude this Court from deciding any of the issues presented .......... 27
A. The constitutional objections were "urged before the Commission" .......... 27
B. Alternatively, there were "reasonable ground[s] for failure to do so" .......... 30
C. If exhaustion were still required, Section 78y(c)(1) would be unconstitutional .......... 32
Conclusion .......... 34
Certificate of Compliance .......... 35
Certificate of Service .......... 36

## Table of Authorities

### Cases

*Advanced Disposal Services East, Inc. v. NLRB*,
820 F.3d 592 (3d Cir. 2016) .......... 30
*Alpine Securities Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024).......... 8
*Axalta Coating Systems LLC v. FAA*,
144 F.4th 467 (3d Cir. 2025).......... 6
*Black v. SEC*,
125 F.4th 541 (4th Cir. 2025) .......... 19
*Bonan v. FDIC*,
__ F.4th __, 2026 WL 2332583
(7th Cir. Aug. 12, 2026) .......... 8
*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936).......... 14–16, 18
*Edd Potter Coal Co. v. Director, Office of Workers' Compensation Programs*,
39 F.4th 202 (4th Cir. 2022) .......... 27–29
*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991).......... 8–9
*FCC v. AT&T, Inc.*,
608 U.S. 531 (2026).......... 7
*FCC v. Consumers' Research*,
606 U.S. 656 (2025).......... 17–18
*Jones Bros., Inc. v. Secretary of Labor*,
989 F.3d 669 (6th Cir. 2018).......... 30
*Jones v. Bock*,
549 U.S. 199 (2007).......... 29
*Kerpen v. Metropolitan Washington Airports Authority*,
907 F.3d 152 (4th Cir. 2018).......... 21–23
*Lebron v. National Railroad Passenger Corp.*,
513 U.S. 374 (1995).......... 21–22
*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024).......... 28–30

*Lucia v. SEC*,
585 U.S. 237 (2018) .......... 19, 22–23
*Manhattan Community Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 10
*McCarthy v. Madigan*,
503 U.S. 140 (1992) .......... 33
*National Horsemen's Benevolent & Protective Ass'n v. Black*,
178 F.4th 224 (5th Cir. 2026) .......... 22
*NLRB v. North Mountain Foothills Apartments*,
157 F.4th 1089 (9th Cir. 2025) .......... 31
*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) .......... 17
*Ortega v. OCC*,
155 F.4th 394 (5th Cir. 2025) .......... 8
*Ross v. Blake*,
578 U.S. 632 (2016) .......... 29
*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 26
*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 4–7
*Silver v. NYSE*,
373 U.S. 341 (1963) .......... 21
*Sligo Creek Center v. HHS*,
177 F.4th 556 (4th Cir. 2026) .......... 6
*Smith v. SEC*,
178 F.4th 312 (6th Cir. 2026) .......... 31
*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) .......... 14–15
*Texas Tobacco Barn, LLC v. HHS*,
180 F.4th 229 (5th Cir. 2026) .......... 5
*Thomas v. Union Carbide Agricultural Products Co.*,
473 U.S. 568 (1985) .......... 7
*Woodford v. Ngo*,
548 U.S. 81 (2006) .......... 29

## Constitutional Provisions

U.S. Const. amend. V ........................................................................ 8, 10–13
U.S. Const. amend. VII ........................................................................ 3–8, 11
U.S. Const. art. I........................................................................................ 8
U.S. Const. art. II ........................................................................ 19, 21–23
U.S. Const. art. III..............................................................2–3, 6–8, 10–13, 32

## Statutes

15 U.S.C. § 78f(b)(1) ........................................................................ 2
15 U.S.C. § 78f(b)(6) ........................................................................ 2
15 U.S.C. § 78f(b)(7) ........................................................................ 2
15 U.S.C. § 78*o*-3 ........................................................................ 21
15 U.S.C. § 78*o*-3(b)(1)–(15) ............................................................ 19
15 U.S.C. § 78*o*-3(b)(2)...................................................................... 2, 20
15 U.S.C. § 78*o*-3(b)(4)...................................................................... 20
15 U.S.C. § 78*o*-3(b)(7)...................................................................... 2, 20
15 U.S.C. § 78*o*-3(b)(8)...................................................................... 2
15 U.S.C. § 78*o*-3(h)(1) ..................................................................... 19
15 U.S.C. § 78s................................................................................ 25
15 U.S.C. § 78s(d)(2)....................................................................... 2, 19
15 U.S.C. § 78s(e)(1) ........................................................................ 2
15 U.S.C. § 78y(a)(1)........................................................................ 2
15 U.S.C. § 78y(a)(4)........................................................................ 26
15 U.S.C. § 78y(a)(5)........................................................................ 24
15 U.S.C. § 78y(c)(1) ........................................................ 27–30, 32–34
15 U.S.C. § 828 ................................................................................ 15
15 U.S.C. § 852 ................................................................................ 15
29 U.S.C. § 160(e) ...................................................................... 30–31, 33
30 U.S.C. § 816(a)(1)........................................................................ 30
42 U.S.C. § 1997e(a) ...................................................................... 29, 33
Pub. L. No. 98-38, § 3, 97 Stat. 205, 206–07 (1983)................................ 1

## Other Authorities

17 C.F.R. § 201.420(c)................................................................ 27–29
90 Fed. Reg. 25,689 (June 17, 2025) .................................................. 16

FINRA Rule 8210 .......... 19
FINRA Rule 8310 .......... 19
FINRA Rule 8313 .......... 19
FINRA Rule 8320 .......... 16
FINRA Rule 8320(a) .......... 13, 18
FINRA Rule 9120 .......... 19
FINRA Rule 9211–9213 .......... 19
FINRA Rule 9235 .......... 19
FINRA Rule 9252 .......... 19
FINRA Rule 9263 .......... 19
FINRA Rule 9268 .......... 19
FINRA Rule 9268(f) .......... 16
FINRA Rule 9310 .......... 19
FINRA Rule 9311 .......... 19
FINRA Rule 9331 .......... 19
FINRA Rule 9351 .......... 19
FINRA Rule 9552 .......... 16
*Henry Brockholst Livingston*,
Oyez, https://t.ly/hdU7b (last visited Sep. 20, 2026) .......... 1
Letter from D. John Sauer, Solicitor General, to Hon. Mike Johnson,
Speaker, U.S. House of Representatives (Aug. 25, 2026) .......... 4–6
U.S. Department of Justice, Office of Legal Counsel,
*The Test for Determining "Officer" Status Under the*
*Appointments Clause* (Jan. 16, 2025) .......... 22–23
U.S. Government Accountability Office, *Securities Regulation:*
*Opportunities Exist to Improve SEC's Oversight of FINRA*,
GAO-12-625 (May 30, 2012) .......... 2
U.S. Government Accountability Office, *Securities Regulation:*
*SEC Can Further Enhance Its Oversight Program of FINRA*,
GAO-15-376 (Apr. 30, 2015) .......... 2

## Introduction

The Securities and Exchange Commission (SEC) and Financial Industry Regulatory Authority, Inc. (FINRA), are right about one thing. The "industry policed itself" when the first stock exchanges were formed in the 1790s. Intervenor FINRA's Br. ("Int.") 1, Int.5. The people who formed these stock exchanges swore to uphold "high standards of commercial honor," Respondent SEC's Br. ("Resp.") 16, just as they swore to police themselves through dueling because that's what standards of high honor meant at the time. *See, e.g.*, *Henry Brockholst Livingston*, Oyez, https://t.ly/hdU7b (last visited Sep. 20, 2026) (stating that Justice Livingston, a New York City elite, "killed a man in a duel in 1798" with impunity and was appointed Associate Justice in 1806). Absent state or federal legislation, those practices continued. That did not make them right. Today, taking the law into one's own hands and resorting to self-help (as the allegedly injured, or as a non-injured person purporting to act for the greater good) rarely, if ever, proceeds without resort to courts. The person taking the law into their own hands is the wrongdoer.

In 1983, Congress amended securities statutes and fundamentally changed the relationship among brokers and dealers, FINRA, and SEC. Congress barred Americans from engaging in the securities business unless they joined a registered exchange or securities association. *See* Pub. L. No. 98-38, § 3, 97 Stat. 205, 206–07 (1983) (amending 15 U.S.C. § 78*o*(b)(8)). Less than 20 years ago, FINRA was incorporated, registered

with SEC, and remains SEC's only national regulator. FINRA membership is compulsory. If it were voluntary, few, if any, would join.

The events relevant to this case occurred during 2010–2015. In 2012, the U.S. Government Accountability Office found SEC oversight of FINRA deficient. GAO, *Securities Regulation: Opportunities Exist to Improve SEC's Oversight of the Financial Industry Regulatory Authority*, GAO-12-625 (May 30, 2012), https://www.gao.gov/products/gao-12-625. Again in 2015, GAO found SEC had failed to enhance its oversight of FINRA. GAO, *Securities Regulation: SEC Can Further Enhance Its Oversight Program of FINRA*, GAO-15-376 (Apr. 30, 2015), https://www.gao.gov/products/gao-15-376.

FINRA is required by law to enforce securities law through a procedure that excludes Article III judges and juries. *See* 15 U.S.C. §§ 78f(b)(1), (6)–(7); 78*o*-3(b)(2), (7)–(8). FINRA admits that Congress "impose[d]" these "extensive obligations" on FINRA and thereby outlawed self-help within the securities industry. Int.7. The enforcement target may appeal any punishment to SEC, *id.* § 78s(d)(2), (e)(1), and then seek review in an Article III appellate court, *id.* § 78y(a)(1). That is, Congress did not show "preference for private self-regulation," Int.7, but rather assigned the judicial power to deprive people of property or liberty, i.e., decide private-rights cases, to entities entirely outside Article III (FINRA and SEC). Congress's elimination of self-help was not wrong. But

Congress erred when it deposited government power into a private entity and Article III power into SEC, an Executive Branch agency.

Petitioners Frank Harmon Black (Black) and Southeast Investments, N.C., Inc. (Southeast) are here today because they followed the *FINRA-recommended* system of electronic and hardcopy email retention, JA0018, that FINRA later claimed amounts to fraudulent or negligent recordkeeping and supervision, JA0011, JA0195 (Black/Southeast immediately switched to the then-new FINRA-recommended Smarsh system, JA0385 (Doc. 71), JA0188 n.178). For following FINRA's recommendations, Black remained barred from the industry for over four-and-a-half years. JA0219; JA0022. And Black/Southeast now remain on the hook to pay FINRA $73,500 for allegedly fraudulent or negligent recordkeeping and supervision that FINRA failed to prove. JA0022.

The Court should vacate and set aside the operative orders entered against Petitioners Black and Southeast.

## Argument

### I. FINRA/SEC adjudication violates the Seventh Amendment

**1.** Respondent SEC does not respond to Black/Southeast's Seventh Amendment arguments. Nor does SEC dispute that FINRA/SEC adjudication violates the Seventh Amendment. And SEC does not dispute that this case involves adjudication of private rights that FINRA and the Executive Branch are categorically forbidden from adjudicating.

Nor can it. The United States Solicitor General has taken the position that "the Seventh Amendment generally guarantees a right to trial by jury before the imposition of civil penalties, except in cases involving public rights." Letter from D. John Sauer, Solic. Gen., U.S. Dep't of Just., to Hon. Mike Johnson, Speaker, U.S. House of Representatives, at 1 (Aug. 25, 2026), https://t.ly/0vmzG. Agreeing with Black/Southeast, the Solicitor General states that "courts should ascertain whether a penalty adjudication involves public rights primarily by examining whether the case falls within 'historic categories of adjudications' that could be conducted by the Executive Branch or instead 'is made of the stuff of the traditional actions' tried exclusively by courts." *Id.* The Supreme Court, the Solicitor General admits, "expressly … rejected the notion that Congress's authority over interstate commerce can alone justify applying the public-rights doctrine." *Id.* (citing *SEC v. Jarkesy*, 603 U.S. 109 (2024)). Nor does an adjudication "fi[t] within the public-rights doctrine simply because it concerns public health." *Id.* at 1–2. Despite giving a history of self-regulation, neither SEC nor FINRA can point to any "historic categories of adjudications" recognized by the Supreme Court that would make FINRA/SEC adjudication one concerning public rights.

Mirroring the Solicitor General's and Black/Southeast's arguments, SEC concedes that FINRA/SEC adjudication does not "fal[l] within 'historic categories of adjudications' that could be conducted by the

Executive Branch." *Id.* at 1; *see* Resp.5–14 (stating that modern FINRA/SEC adjudication does not resemble any historic public-rights adjudications conducted by the Executive Branch). According to the Solicitor General, the Fifth Circuit "correctly rejected certain arguments emphasized by the government in" *Texas Tobacco Barn, LLC v. HHS*, 180 F.4th 229 (5th Cir. 2026). *Sauer Letter* at 1. SEC, accordingly, does not now present those arguments here.

This Court should conclude that FINRA/SEC adjudication violates the Seventh Amendment and thereby vacate SEC's award to FINRA of monetary penalties payable by Black/Southeast.

**2.** Intervenor FINRA, too, concedes that modern FINRA/SEC adjudication does not resemble any historic adjudication conducted by the Executive Branch. *See* Int.5–8.

FINRA nonetheless argues that "FINRA's disciplinary claims" based on "Section 17(a) of the Exchange Act," 15 U.S.C. § 78q(a)(1), "impose technical, industry-specific duties" that fall within the public-rights exception. Int.40. But FINRA cites nothing to support its public-rights argument. And FINRA does not even attempt to justify its internal adjudication as satisfying the applicable two-prong test (no legal cause of action and no legal remedy). As Black/Southeast explained (Petitioners' Br. ("Pet.") 13–18), monetary fines imposed for legal claims derived from the common law of fraud and negligence, such as the document-retention and supervision obligations here, satisfy both prongs of *Jarkesy*: "money

damages" and a "cause of action" that is "borrow[ed] … from the common law." 603 U.S. at 123, 136.

To the extent FINRA relies on *Sligo Creek* and *Axalta*, the Solicitor General has already conceded that "technical, industry-specific duties" cannot be justified as falling within the public-rights exception where, as here, such claims were not historically adjudicated within the Executive Branch. Int.40 (citing *Sligo Creek Ctr. v. HHS*, 177 F.4th 556, 560–61 (4th Cir. 2026); *Axalta Coating Sys. LLC v. FAA*, 144 F.4th 467, 475–77 (3d Cir. 2025)); *Sauer Letter*, https://t.ly/0vmzG. FINRA cannot now take a position that its regulator, SEC, has specifically rejected.

FINRA/SEC adjudication violates the Seventh Amendment. The Court should so hold and vacate the operative orders.

## II. FINRA/SEC adjudication violates Article III

**1.** SEC does not dispute that Article III adjudication of private-rights claims of record-retention and supervision obligations is "mandatory." *Jarkesy*, 603 U.S. at 128. But FINRA does. Int.38–39. It says "FINRA's disciplinary allegations concerned matters categorically exempt from Article III." Int.38. In support, however, FINRA string-cites examples of "*executive agencies*" that various statutes have authorized to "conduct adjudications" of recognized public-rights categories of cases. Int.38 (emphasis added). Those examples are classic, narrow categories of public-rights cases recognized by *Jarkesy*; they are *not* cases, as here, relating to initial private-entity adjudication.

FINRA does not show, nor cite, any case where courts have upheld executive adjudication of private rights, for there aren't any. Int.38–39. Nor does FINRA show, or cite, any case where courts have upheld private adjudication of private rights. FINRA cites (Int.39 n.5) *Thomas v. Union Carbide Agricultural Products Co.*, which held that public-rights cases are "appropriate for *agency* resolution with limited involvement by the Article III judiciary," nothing more. 473 U.S. 568, 594 (1985) (emphasis added).

None of the other cases FINRA cites endorses FINRA/SEC adjudication of private rights. And FINRA does not specify which of the "six narrow categories" of public-rights cases under which its claims against Black/Southeast fall. *See* Pet.20. To the contrary, FINRA admits, as it must, that Article III and the Seventh Amendment "appl[y] in 'all proceedings' in which 'legal rights' are to be 'settled.'" Int.39 (quoting *FCC v. AT&T, Inc.*, 608 U.S. 531, 541 (2026)). FINRA/SEC adjudication here "settled" "legal rights": Black/Southeast must pay FINRA $73,500. JA0017–JA0022. Article III adjudication for settling those legal rights was, therefore, "mandatory." *Jarkesy*, 603 U.S. at 128. Because FINRA/SEC adjudged Black/Southeast liable to FINRA for $73,500 without the benefit of an Article III court with a jury, the Court should vacate the operative orders.

**2.** A long history of private self-regulation, as FINRA argues, Int.39–40, is not a recognized exception to Article III. No textual

justification exists in the Constitution to read such an exception into the words of Articles I or III. The only FINRA-related case it cites—*Alpine*—has nothing to say about Article III. Int.40 (citing *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1319–21 (D.C. Cir. 2024)). And FINRA's fly-by citations to internal adjudications at the Office of the Comptroller of the Currency or the Federal Deposit Insurance Corporation, both federal agencies, not private entities, come nowhere close to supporting FINRA's assertion that courts or Congress have "repeatedly reaffirmed" FINRA's "self-regulatory framework." Int.39–40 (citing *Ortega v. OCC*, 155 F.4th 394, 408–09 (5th Cir. 2025); *Bonan v. FDIC*, __ F.4th __, 2026 WL 2332583 (7th Cir. Aug. 12, 2026)).

**3.** FINRA's attempt (Int.36–37) to circumvent Article III, and the Seventh and Fifth Amendments, based on the state-action doctrine likewise finds no support in governing caselaw (FINRA does not interpose the state-action doctrine into the other issues here). Nothing in the operative Supreme Court cases on Article III and the Seventh Amendment adds the state-action doctrine as a third prong to the two-prong test (cause of action plus remedy). Nor has the Supreme Court ever recognized a private-versus-private suit as an exception to Article III based on the state-action doctrine.

If the state-action doctrine were salient, FINRA's attempt at circumventing the Constitution would still fail. The principal case FINRA offers in support of its position, Int.36—*Edmonson*—says that

where, as here, "governmental authority … dominate[s] an activity to such an extent that its participants must be deemed to act with the authority of the government," then the private party "must … be subject to constitutional constraints." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991). There, the Court did not permit the private company to peremptorily strike jurors based on their race because peremptory strikes of petit jurors by private parties "rise … to the level of state action." *Id.* at 622.

Even assuming the state-action doctrine is apposite here, FINRA/SEC adjudication easily satisfies the test: "overt, significant participation of the government," viz. SEC, where FINRA's regulatory power "simply could not exist" "outside the … system which the government alone administers." *Id.* Whatever the history of self-regulation may be, FINRA's regulatory power today derives from SEC's approval, based on the Exchange Act, of FINRA as the "only" national organization that is permitted to wield the government's power. Int.6. SEC "alone administers" the Exchange Act, and as relevant here, FINRA must operate inside that system to act as SEC's "frontline regulator." Int.1. Within this system, FINRA exercises government power unilaterally. FINRA's decision to investigate or prosecute is unilateral; SEC is altogether out of the picture. Same with two levels of FINRA adjudication; there is no SEC involvement whatsoever. As such, FINRA is "subject to constitutional constraints." *Edmonson*, 500 U.S. at 620.

Here, that means FINRA/SEC adjudication is subject to Article III, and the Seventh and Fifth Amendments.

FINRA does not explain how FINRA's regulation of the securities industry falls outside "one of the 'few limited circumstances' in which private conduct qualifies as state action." Int.36–37 (quoting *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019)). *Halleck* listed three circumstances where "a private entity can qualify as a state actor" and FINRA meets each of them. *Id.* First is "when the private entity performs a traditional, exclusive public function." *Id.* In enforcing the Exchange Act against industry participants like Black/Southeast, FINRA does precisely that. Second is "when the government compels the private entity to take a particular action." *Id.* The Exchange Act compels FINRA to enforce the Act against brokers and dealers. Third is "when the government acts jointly with the private entity." *Id.* The Exchange Act requires FINRA to work jointly with SEC in regulating brokers and dealers. FINRA is SEC's adjunct. As the federal securities law "frontline regulator," Int.1, FINRA is a state actor.

Even if not, nothing about the state-action doctrine would give SEC, a federal agency, carte blanche to violate the Constitution. Nothing about the state-action doctrine saves FINRA/SEC adjudication.

## III. FINRA/SEC's adjudication structure violates the Fifth Amendment's Due Process Clause

FINRA/SEC's response to Black/Southeast's Fifth Amendment argument is off topic and without merit. Resp.63–65; Int.42–45. Black/Southeast submit that the Fifth Amendment requires (1) "*judicial* process" before they can be deprived of liberty or property, Pet.26, and (2) complete absence of the "profit motive," Pet.28. SEC does not address these arguments at all, and FINRA's attempt to address the latter argument about FINRA's profit motive, Int.45, falls short.

**1.** SEC maintains that because this Court reviews SEC's order, not FINRA's decision, no due process violations "persisted through" SEC's order. Resp.63–64. SEC does not dispute that Black/Southeast were entitled to pre-deprivation judicial process, i.e., a summons or writ to appear or respond in court for the wrongs FINRA alleged against them. Pet.26. SEC does not dispute that instead of receiving that judicial process, FINRA made Black/Southeast answerable to FINRA in its homebrew tribunals. SEC also does not dispute that the Fifth Amendment requirement of judicial process structurally guarantees an independent and impartial decisionmaker that FINRA/SEC are institutionally incapable of providing. Indeed, in declining to defend FINRA/SEC actions under Article III and the Seventh Amendment, SEC admits that only Article III courts and juries are capable of providing the kind of independent, impartial decisionmaker that the Fifth Amendment

requires. In sum, SEC does not address Black/Southeast's Fifth Amendment arguments at all.

Likewise, FINRA's response to the Fifth Amendment's structural guarantee of judicial process misses the mark. FINRA argues that SEC's "pervasive oversight" addressed due-process deficits in FINRA adjudication. Int.42. But little, if any, SEC oversight exists. FINRA does not dispute that SEC does not supervise FINRA's exercise of prosecutorial discretion. FINRA does not dispute that its hearing officers conduct trials and appeals under the challenged statutory scheme. Int.42. FINRA does not dispute that it is a private entity. FINRA does not dispute that the industry bar it imposed on Black went into effect immediately, and SEC did not lift it for over four-and-a-half years. That is, FINRA, too, does not address how the existing structure of FINRA/SEC adjudication satisfies the Fifth Amendment requirement that an enforcement target receive front-end judicial process, i.e., an Article III district-court original proceeding, with juries where appropriate, followed by ordinary appellate review in this Court and the Supreme Court.

FINRA's attempt at misdirection, therefore, fails. FINRA asserts that Black/Southeast are "now receiving" the judicial process they were owed from the beginning. Int.44. Not so. FINRA did not allege wrongdoing against Black/Southeast in federal district court by filing a complaint and having the district clerk issue summons. No discovery or

depositions occurred under an Article III judge's supervision or oversight. No jury decided facts. No jury and no court rendered verdict and judgment. Yet, the Fifth Amendment's guarantee of judicial process requires an Article III judge and jury that Black/Southeast never received. That lack of judicial process is fatal to FINRA/SEC's Fifth Amendment arguments.

**2.** As to FINRA's impermissible profit motive, Pet.28–29, FINRA maintains that its hearing officers do not have a "dual role." Int.45. The lack of a dual role is irrelevant here because, as Black/Southeast explained, Pet.28–29, the appearance of impartiality and temptation is sufficient. FINRA does not dispute that its hearing officers are eligible for and do receive "performance-based incentive compensation." Pet.29 (simplified). And FINRA does not dispute that the fines it levies it pockets for "general corporate purposes." FINRA Rule 8320(a). FINRA does not claim, nor can it, that a single-role FINRA officer of ordinary means and intelligence, that is eligible for performance-based incentive compensation, has no incentive whatsoever to increase their employer's coffers and thereby maximize their own compensation. FINRA pretension to the contrary cannot possibly be right.

FINRA/SEC adjudication violates the Fifth Amendment twice over. Accordingly, the Court should set aside the operative orders.

## IV. FINRA/SEC's adjudication structure violates the nondelegation doctrine

**1.** FINRA and SEC attempt to set aside the nondelegation doctrine question by pointing principally to *Sunshine Anthracite* and a slew of supervision-of-rulemaking cases. Int.27; Resp.53–54; *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940).

*Sunshine Anthracite* is inapposite here. *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), supplies the rule of decision. *See* Pet.29. Congress enacted a new coal-related statute after *Carter* held unconstitutional the predecessor statute. *Sunshine Anthracite* was a coal company's challenge to the new statute. Under the new scheme, companies that were not exempt needed to pay tax set by statute on the sale of bituminous coal. *Id.* at 389. Sunshine Anthracite argued it was exempt from the tax.

The since-dismantled National Bituminous Coal Commission, a federal agency, "held a public hearing" on the coal company's "application for exemption," where the company "introduced evidence," and presented "oral argument before the Commission." *Sunshine Anthracite*, 310 U.S. at 390. The Commission then entered an order holding that the company was not exempt because the company's "coal was bituminous within the meaning of § 17(b)." *Id.* at 390–91. On appeal, the circuit court affirmed the Commission's decision. *Id.* at 391.

Meanwhile, the federal tax collector demanded tax payment and accrued interest from the company. *Id.* The company filed suit in federal

court to enjoin the collection of the tax, the court denied the injunction, and the case then proceeded to the Supreme Court. *Id.* The Supreme Court first rejected the company's statutory-interpretation argument. *Id.* at 392. As to the company's argument that the statutory scheme is "an invalid delegation of legislative and judicial power," *id.* at 393, the Court held that the Act does not "contain an invalid delegation of legislative" or "judicial power" to the Commission. *Id.* at 397, 400.

Delegation of governmental power to private entities was not at issue. Still, the Court supplied obiter dictum to the effect that Congress did not delegate "its legislative authority to the industry," which was true of the new statute, which has since been repealed, too. *Id.* at 399; *see* 15 U.S.C. §§ 828, 852.

The FINRA/SEC statutory scheme is very different. Nothing in *Sunshine Anthracite*, and certainly not dicta contained therein, can govern the private nondelegation inquiry with respect to FINRA/SEC enforcement. *Carter*'s categorical bar remains the applicable test: delegation of governmental power to private entities remains unlawful as "delegation in its most obnoxious form." 298 U.S. at 311. After *Carter* was decided, Congress repealed the earlier statute that *Carter* found unlawfully delegated governmental power "to the industry" and did not repeat that mistake in the statute at issue in *Sunshine Anthracite*. 310 U.S. at 399.

Resisting *Carter*, SEC assembles a string cite to suggest that courts have insulated "private self-regulatory organizations against private-nondelegation challenges." Resp.54. Most of those cases dealt with narrow delegations of legislative power to private entities, where the product of the private entity's use of the government's legislative power is not effective until after a federal agency approves the rules drafted by the private entity. The same cannot be said about the private entity's use of the government's executive or judicial power. Here, FINRA/SEC do not dispute that (1) FINRA's exercise of prosecutorial discretion is not reviewed by SEC or DOJ, (2) the industry bar goes into effect *before* SEC review, FINRA Rule 9268(f), and (3) FINRA has the power to "summarily suspend or expel from membership" any broker or dealer that fails to pay the fine, FINRA Rule 8320, or even appear to resist FINRA's demands, FINRA Rule 9552. Delegations of executive or judicial power to private entities remains an altogether different question. *See also* NCLA Amicus Br.12–21 (discussing FINRA's "vast executive power with virtually no meaningful SEC supervision or direction") (collecting cases). *See also* Notice of Filing and Immediate Effectiveness of Specified Expulsions and FINRA Actions, 90 Fed. Reg. 25,689 (June 17, 2025) (amending FINRA rules so that expulsions, cancelations and denials, *but not bars*, are effective only after SEC review).

**2.** SEC maintains that it "exercises supervisory authority over FINRA's internal disciplinary decisions." Resp.55. SEC says nothing

about how the existence of hypothetical supervisory authority, Resp.55, addresses the private nondelegation doctrine with respect to delegations of executive and judicial power to FINRA. No case SEC cites has endorsed the notion that backend and after-the-fact SEC review in any way addresses the front-end unconstitutional delegation of the government's executive or judicial power to a private entity.

SEC cites *Oklahoma* for the proposition that FINRA is a "permissible aid[e] and adviso[r]" to SEC when FINRA-proposed rules must be approved by SEC before they go into effect. Resp.56 (quoting *Oklahoma v. United States*, 163 F.4th 294, 307, 309 (6th Cir. 2025)). But *Oklahoma* concerns delegation of *legislative* power; the Sixth Circuit there had nothing to say about delegation of executive or judicial power to a private entity. In other words, if it were true that FINRA is a permissible aide and advisor of SEC with respect to rulemaking, it does not follow that delegation of executive or judicial power to FINRA thereby automatically satisfies the Supreme Court's categorical bar on delegation of executive or judicial power to private entities.

Likewise, *Consumers' Research* does not support SEC. *See* Resp.57 (discussing *FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025)). As Black/Southeast explained, Pet.34, *Consumers' Research* confirms the unlawful delegation to FINRA. The private entity at issue there came nowhere close to the pervasive and unilateral power that FINRA enjoys. SEC has no answer.

Nor does FINRA. Int.31. FINRA tackles *Consumers' Research* by claiming that the "intelligible principle test" does not apply here. Int.31. But *Consumers' Research* applied the intelligible-principle test in the context of delegations to private entities. 606 U.S. at 680. So, the test *a fortiori* applies here.

SEC/FINRA do not say how they prevail if the intelligible-principle test applies. In *Consumers' Research*, the establishment of a private entity to act as FCC's aide, helping the agency collect fees for the universal service fund, did not violate the intelligible-principle test because the relevant statutes "provide[d] the FCC with determinate standards for operating the universal-service program." 606 U.S. at 684. Here, the fines FINRA levied on Black/Southeast and affirmed by SEC are payable to FINRA, not for the general benefit of the public, but rather for *FINRA*'s "general corporate purposes." FINRA Rule 8320(a). SEC/FINRA point to nothing in the Exchange Act, for there is nothing there, that provides any standard for imposing and collecting fines for FINRA's benefit.

FINRA/SEC adjudication violates the nondelegation doctrine under any application of *Carter* or *Consumers' Research*. As a result, the Court should set aside the operative orders.

## V. FINRA adjudicators are not properly appointed

**1.** SEC does not dispute that FINRA board members must be appointed in compliance with Article II. SEC only contests the issue with respect to "FINRA hearing officers." Resp.60.

Congress and SEC assigned nationwide federal regulatory power to FINRA, even though no constitutional actor appoints its officers and no federal official can remove them. SEC contests Black/Southeast's Appointments Clause argument because, in SEC's view, FINRA hearing officers do not "occupy continuing offices," or "exercise significant authority that only the government can constitutionally exercise." Resp.60. SEC is wrong on both counts.

First, *Lucia v. SEC* confirmed the longstanding rule that "ongoing" statutory duties establish an office by law, whatever the position's label. 585 U.S. 237, 246 (2018). FINRA board members and hearing officers have ongoing statutory duties: Congress has empowered them to institute and decide cases, 15 U.S.C. §§ 78*o*-3(h)(1), 78s(d)(2); *see also*, FINRA Rules 8210, 8310, 8313, 9120, 9211–9213, 9235, 9252, 9263, 9268, 9280, 9310, 9311, 9331, 9351 (implementing those statutory duties). Participation in the securities industry as brokers and dealers requires registration with FINRA. *Black v. SEC*, 125 F.4th 541, 543 (4th Cir. 2025) (brokers and dealers "must join" FINRA). FINRA is required to "carry out the purposes of this section," and "enforce compliance by its members … with the provisions of this chapter," which are just a few of

the ongoing statutory duties established by law. 15 U.S.C. § 78*o*-3(b)(1)–(15). FINRA board members and hearing officers therefore "occupy a continuing position 'established by Law.'" Resp.60.

FINRA's "private origins and lineage" is inapposite to the Appointments Clause inquiry. Resp.61. The *office* of FINRA's board of "directors" and hearing officers, all of whom are tasked with "enforc[ing] compliance … with" federal securities law by "appropriately disciplin[ing brokers and dealers] for violation of any provision of this chapter" is established by law: 15 U.S.C. § 78*o*-3(b)(2), (b)(4), (b)(7). When SEC recognized FINRA as the only organization authorized to perform statutory duties, SEC confirmed that FINRA is established by law, and its board members and hearing officers are vested by law with ongoing statutory duties.

Second, SEC is also wrong when it says that "FINRA hearing officers do not perform significant functions." Resp.61. FINRA officers have the unilateral executive power to institute disciplinary proceedings; there is no provision in law to obtain SEC's or DOJ's sign-off for FINRA's unilateral exercise of the Executive Branch's prosecutorial discretion. FINRA officers then decide that case in-house, again, on their own, and thereby unilaterally exercise the Executive or the Judicial Branch's power. During that in-house proceeding, FINRA officers create federal law and thereby unilaterally exercise the Legislative Branch's power. *Cf.* Pet.31–32 (providing apposite cites). By any measure, FINRA board

members and officers "exercise significant authority that only the government can constitutionally exercise." Resp.60.

Dissatisfied with this answer, SEC attempts to justify FINRA's statutorily vested powers as "private functions of [an] organization." Resp.62. That attempt fails because the only authority SEC can muster does not support SEC. 15 U.S.C. § 78*o*-3; Resp.62 (citing *Silver v. NYSE*, 373 U.S. 341, 352–53 (1963) (discussing legislative reports recommending that the exchanges be given "sufficient power" "for the expulsion, suspension, or disciplining of a" broker or dealer)).

FINRA is materially different from private unions. FINRA is plainly vested with the *government's* power to further the *governmental* objective of regulating the securities industry. FINRA board members and officers exercise significant government authority and occupy positions established by law. As such, their appointments must comply with Article II, which they do not.

**2.** FINRA, for its part, argues, based on *Lebron* and *Kerpen*, that none of its officers is "subject to Article II." Int.31–36 (discussing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995); *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152 (4th Cir. 2018)). Those cases, however, are inapposite here.

*Lebron* and *Kerpen* determined whether a private corporation is a federal entity; those cases did not determine whether certain persons must be appointed in compliance with Article II. *Lebron* held that

Amtrak, a private company incorporated in D.C., is "part of the Government for purposes of the First Amendment." 513 U.S. at 399. And *Kerpen*, applying *Lebron*'s creation-and-control test, held that the D.C.-area airports authority is not a "federal entity." 907 F.3d at 158–160.

That creation-and-control test is inapposite here because Black/Southeast do not suggest that FINRA is a "federal entity"; it is not. *Contra Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 250 (5th Cir. 2026) (where the challenger argued "that the Authority is part of the federal government for Appointments Clause purposes"); Int.33–34 (invoking *Horsemen's*). Rather, Black/Southeast argue that FINRA board members and hearing officers must be appointed in compliance with the Appointments Clause because they "exercise significant governmental powers." Pet.35 (discussing relevant cases). Tellingly, perhaps for this reason, SEC does not even attempt to invoke *Lebron*, choosing instead to stick with the relevant *Lucia* test. And the DOJ Office of Legal Counsel memorandum that FINRA invokes in support, Int.32, likewise, also does not take the position that *Lebron* is the governing test in all Appointments Clause cases. DOJ, Off. of Legal Couns., *The Test for Determining "Officer" Status Under the Appointments Clause* 10 n.3 (Jan. 16, 2025), https://t.ly/XbGld.

Nor is *Lebron* an Appointments Clause Step Zero, as FINRA suggests, Int.34–36. According to FINRA, the Court needs to first conclude that FINRA is "part of the federal government" to determine

whether the Appointments Clause applies, and then apply the *Lucia* two-prong test to determine if FINRA board members and hearing officers are "officers" within the meaning of Article II. The Supreme Court has never applied this makeshift three-prong Appointments Clause test. Nor does FINRA pretend any court has. *See* Int.35–36.

Here, the applicable test is *Lucia*'s, which held that to qualify as an officer rather than an employee, the person must occupy a "continuing" position established by law and must exercise "significant" government authority. 585 U.S. at 245; *see also OLC "Officer" Status Mem.* 1 (giving the *Lucia* test as the authoritative test for the Appointments Clause in the header of the memorandum). "The inquiry," thus, "focuse[s] on the extent of power an individual wields in carrying out his assigned functions," *Lucia*, 585 U.S. at 245; not on whether the individual sits inside a "federal entity." *Kerpen*, 907 F.3d at 160.

As explained above and in Black/Southeast's principal brief, Pet.35–38, FINRA board members and hearing officers easily satisfy the *Lucia* test. They are "officers" within the meaning of Article II. FINRA even claims, as it must, that SEC has the power to "remove from office" any FINRA "officer or director," Int.29 (citing 15 U.S.C. § 78s(h)(4)), which further shows why FINRA officers occupy continuing positions established by law and exercise significant government authority. They must therefore be appointed in compliance with Article II if SEC has the concomitant power to remove them from office, consistent with Article II

requirements for removal of inferior officers. Because they weren't, the operative orders they entered, which the SEC affirmed against Black/Southeast, are void ab initio. The Court should accordingly vacate the operative orders.

## VI. Set aside of operative orders is an appropriate remedy

Neither SEC nor FINRA disputes that set aside (i.e., vacatur) of the operative orders is an appropriate remedy if the Court rules in Black/Southeast's favor for any of the reasons briefed in this case. Nor do they ask for an evidentiary remand "to adduce additional evidence," which is the only scenario in which this Court can possibly remand. 15 U.S.C. § 78y(a)(5). SEC asks the Court to "dismiss the petitions for review." Resp.66. And FINRA asks the Court to "dismiss the petitions in Case Nos. 25-1718 and No. 26-1278, and deny the petition in Case No. 26-1307." Int.46. Neither asks for an evidentiary remand.

## VII. SEC orders should also be set aside because SEC erred in imposing penalties for failure to preserve a representative's wife's 16 personal emails

FINRA does not even attempt to argue why FINRA's decision sanctioning Black/Southeast for supervision and recordkeeping violations, by imposing $73,500 in fines, should be sustained. SEC does. Resp.65–67.

In the main, SEC does not dispute that the 16 personal emails of a Southeast representative's wife that Black/Southeast did not preserve

was the basis for the sanction. Resp.66. SEC nonetheless maintains that some emails that were "customer-related" and were in fact preserved, JA0034–JA0077, was another valid basis for sanctioning Black/Southeast. Resp.66. SEC then admits that it affirmed FINRA when FINRA recharacterized the personal emails as business related and tacked on the preserved customer-related emails purportedly to cobble together evidence of "systemic supervisory failure." Resp.67.

Invalid inferences stacked on top of one another do not amount to evidence of recordkeeping or supervisory deficiencies. Some stray missing emails are not evidence of Black/Southeast's supervisory deficits. More egregious still, the supervision and email system that Black/Southeast had in place at the time was specifically recommended to them *by FINRA*. JA0018. FINRA nonetheless chose to heap inference upon inference to railroad Black/Southeast through its unlawful tribunals. And SEC for its part conducted no evidentiary hearing, nor did it perform true de novo factfinding; words like "de novo," or "independent" to describe SEC review do not appear even once in 15 U.S.C. § 78s or anywhere else in the FINRA/SEC statutory scheme. Instead, SEC chose to perpetuate FINRA's error.

What's more, nowhere in SEC's 2023 decision, JA0001–JA0022, does SEC rely on the evidence it now claims forms the basis for SEC's sustaining of FINRA's imposition of $73,500 on Black/Southeast. The Supreme Court does not permit agencies to do that. "[A]n administrative

order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). SEC should be estopped from now claiming as the basis for its decision something that SEC did not rely on in issuing its decision.

In the end, the issue boils down to this: FINRA, the prosecutor, simply overpromised and underperformed. The silence in FINRA's brief about why Black/Southeast did not meet the statutory supervision and recordkeeping obligations is telling. That silence should be viewed as FINRA's admission that FINRA's imposition of monetary penalties has no basis in fact or law.

Also telling is FINRA/SEC's lack of acknowledgment that a reasonable jury would find it hard to find that Black/Southeast committed any wrong here. This matter should have been tried to a jury to begin with, but in FINRA/SEC's view that's a different matter.

Finally, SEC concedes that it conducted no evidentiary hearing and found no facts. That concession is important because the substantial-evidence standard given in the statute applies only to the "findings *of the Commission* as to the facts." 15 U.S.C. § 78y(a)(4) (emphasis added). That standard does not apply to FINRA-found facts relied upon by SEC. *See also* Pet.42.

In sum, the Court should set aside the operative orders.

## VIII. Section 78y(c)(1) does not preclude this Court from deciding any of the issues presented

The statutory exhaustion provision states, "No objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). Following "unless," the statute gives two alternative scenarios, either of which overcomes non-exhaustion. Exhaustion is not required: (1) where the "objection … was urged before the Commission," "or" (2) where "there was reasonable ground for failure to do so." *Id.*

### A. The constitutional objections were "urged before the Commission"

As to the first, SEC interprets "urged before the Commission" as requiring Black/Southeast to have presented constitutional issues to SEC in the "opening brief before the Commission." Resp.38 (citing 17 C.F.R. § 201.420(c)). FINRA would draw the line earlier. According to FINRA, Black/Southeast needed to present constitutional issues "before FINRA." Int.21. Not just "before FINRA" once FINRA files a complaint with itself, Int.2, but, brazenly, earlier still: at the time of "joining or registering with FINRA." Int.42. FINRA/SEC both rely on the SEC rule interpreting Section 78y(c)(1), and this Court's *Edd Potter Coal Co. v. Dir., Off. of*

*Workers' Comp. Programs*, 39 F.4th 202 (4th Cir. 2022). Let's take each in turn.

**1.** The SEC rule, 17 C.F.R. § 201.420(c), recognizes "the discretion of the Commission" to excuse exhaustion. That is, SEC by rule has not drawn the exhaustion line at the "opening brief" filed before SEC. *Id.* SEC does not demand deference to its interpretation of Section 78y(c)(1), nor does it demand that the Court defer to its litigating position. Nor can it. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024).

This Court must apply Congress's words as written. Section 78y(c)(1) simply requires an objection to be "urged before the Commission," and Congress chose not to specify at what point in the proceeding before the Commission that objection must be made. SEC does not dispute that this case was "before the Commission" when Black/Southeast "urged" the constitutional objections. All questions before this Court are therefore properly exhausted.

**2.** *Edd Potter* also does not help SEC or FINRA. *Edd Potter* did not involve statutory exhaustion, a point FINRA/SEC themselves rely on. 39 F.4th at 207 ("[T]he Director concedes that nothing in the Black Lung Benefits Act explicitly requires issue exhaustion."); Resp.47. Given the statutory silence, the Benefits Review Board had invoked its inherent rulemaking authority to issue regulations "requir[ing] issue exhaustion both before the ALJ and before the Board." *Id.* In that context, this Court held that exhaustion was indeed required at "both" levels.

The situation here is different. SEC claims to have interpreted Section 78y(c)(1) to draw the exhaustion line at the "opening brief" before the Commission when the statute itself draws no such line. 17 C.F.R. § 201.420(c). Following *Loper Bright*, this Court's job is to give effect to the best reading of the statute. The inapposite *Edd Potter* does not stand in this Court's way because *Edd Potter* has nothing to do with interpreting and applying the words of 15 U.S.C. § 78y(c)(1).

For the same reason, SEC's reliance on Prison Litigation Reform Act's (PLRA) statutory exhaustion provision is not relevant here. *See, e.g.*, Resp.37–38 (quoting *Woodford v. Ngo*, 548 U.S. 81 (2006), and *Jones v. Bock*, 549 U.S. 199 (2007), involving PLRA exhaustion); Pet.46–47 (distinguishing PLRA exhaustion from exhaustion under § 78y(c)(1)). The PLRA exhaustion statute says that "such administrative remedies as are available" should be exhausted. 42 U.S.C. § 1997e(a). Courts view the PLRA provision as "mandatory," "foreclosing judicial discretion." *Ross v. Blake*, 578 U.S. 632, 639 (2016). Section 78y(c)(1) says nothing of the sort; it recognizes wide judicial discretion to excuse exhaustion for any "reasonable ground."

Black/Southeast plainly "urged before the Commission" all of the questions they present for resolution to this Court. *See* Pet.43–45. The Court should proceed to resolve those exhausted questions.

### B. Alternatively, there were "reasonable ground[s] for failure to do so"

If the Court concludes that Black/Southeast did not exhaust issues "before the Commission," the Court must then determine whether "there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). There were at least two reasonable grounds: (1) FINRA/SEC's lack of power to resolve structural or facial constitutional claims, and (2) futility.

**1.** Structural or facial claims. FINRA/SEC do not dispute they lack power to change their own structure, procedures, and existence absent Congressional or judicial directive. FINRA/SEC do not assert that they possess the "judicial" power "to say what the law is." *Loper Bright*, 603 U.S. at 385. They do not even contest the structural or facial nature of Black/Southeast's claims. Still, they maintain, without explanation, that the nature of Black/Southeast's structural or facial claims does not supply a "reasonable ground" to excuse exhaustion. Resp.48; Int.22.

The Third and Ninth Circuits, like the Sixth, have excused exhaustion of structural constitutional claims under the "extraordinary circumstances" statutory exhaustion provision of the National Labor Relations Act, 29 U.S.C. § 160(e); *see also* Pet.45–47 (discussing *Jones Bros., Inc. v. Sec'y of Lab.*, 989 F.3d 669 (6th Cir. 2018) (excusing exhaustion under the "extraordinary circumstances" provision of the Mine Act, 30 U.S.C. § 816(a)(1))). *Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592, 598 (3d Cir. 2016), "h[e]ld that a challenge like

this one, which goes to the authority of the Board to act, constitutes an 'extraordinary circumstance' under § 160(e) and can thus be raised for the first time on appeal." And *NLRB v. North Mountain Foothills Apartments*, 157 F.4th 1089, 1097 (9th Cir. 2025), concluded that "an unexhausted constitutional challenge to the workings of the agency itself" is an extraordinary circumstance within the meaning of § 160(e) and the court therefore decided those structural claims. This Court should interpret the "reasonable ground" statute at issue here the same way.

**2.** Futility. SEC claims that it has "repeatedly adjudicated the merits of constitutional challenges." Resp.46 (quoting *Smith v. SEC*, 178 F.4th 312, 322–23 (6th Cir. 2026) (collecting SEC decisions in a string-cite)); Resp.48–49 (same). SEC fails to mention that in every single one of those cases SEC has failed to find constitutional deficits with its own structure, procedures, or existence. SEC's assertion, Resp.46, that it could have "been persuaded to" decide the constitutional questions in Black/Southeast's favor is sheer fantasy.

SEC asserts that it could have provided an "appropriate remedy" to Black/Southeast had they presented the constitutional issues to SEC. Resp.47. Presumably, this "appropriate remedy" is limited to the remedies stated in 15 U.S.C. § 78s(e): affirm, modify, set aside, remand, cancel, reduce, or require remission. *See* Int.24 (acknowledging that "exhaustion is unnecessary when the agency cannot 'provide the relief

requested if the argument succeeds.'" (simplified)). But SEC has no power to declare its or FINRA's structure, procedures, or existence unconstitutional. Futility is not solely about an administrative remedy. Futility is about institutional competence. *See* Pet.48–49. FINRA/SEC do not claim they have the requisite institutional competence to decide questions that, when decided, would fundamentally alter their own structure. That is what makes futility a "reasonable ground" to excuse exhaustion under 15 U.S.C. § 78y(c)(1).

### C. If exhaustion were still required, Section 78y(c)(1) would be unconstitutional

The exhaustion doctrine developed as a method to manage the increasing workload within Article III. If a matter arrives in a federal appellate court from a federal district court, it was natural for courts to conclude that the district judge and juries be given a chance to correct their own errors without having to ask an appellate court to handle error correction.

Something else is at issue here. Congress looked at the judge-made exhaustion doctrine and sought to codify it in certain agency-specific statutes. Congress took a doctrine that works and is perhaps necessary for adjudication within Article III and attempted to graft it on to executive adjudication. In this context, the Exchange Act preserved wide judicial discretion to excuse exhaustion for any "reasonable ground." 15 U.S.C. § 78y(c)(1). The National Labor Relations Act, on the other

hand, cabined judicial discretion to excuse exhaustion to "extraordinary circumstances." 29 U.S.C. § 160(e). Still others, like the Prison Litigation Reform Act, swung the pendulum in the other direction when it eliminated judicial discretion to excuse exhaustion. 42 U.S.C. § 1997e(a).

Central to the exhaustion doctrine, be it statutory or judge-made, is judicial discretion. Exhaustion, like stare decisis, is not an inexorable command. The Supreme Court, for example, has not allowed the government's interests in "efficiency or administrative autonomy" to justify exhaustion requirements. *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). The Supreme Court has excused exhaustion "even where administrative and judicial interests would counsel otherwise." *Id.* Congress preserved and endorsed the Supreme Court's requirement of excusing exhaustion for "reasonable ground[s]," 15 U.S.C. § 78y(c)(1), which remains an "intensely practical" inquiry. *McCarthy*, 503 U.S. at 146. Congress, like the Supreme Court, did not in any way attempt to narrow judicial discretion to excuse exhaustion where "the nature of the claim presented and the characteristics of the particular administrative procedure provided" both show reasonable grounds for excusing exhaustion. *Id.* FINRA/SEC do not show how the nature of the claims Black/Southeast presented here and the characteristics of FINRA/SEC adjudication do not supply reasonable grounds to excuse exhaustion. And FINRA/SEC do not show how requiring exhaustion here serves any of the interests identified in *McCarthy*.

SEC does not address Black/Southeast's argument that the Court should excuse exhaustion here to avoid having to decide whether Section 78y(c)(1) is unconstitutional. Nor does FINRA.

In sum, Black/Southeast exhausted all issues before SEC. If not, there are ample reasonable grounds for excusing exhaustion here.

**Conclusion**

The Court should set aside the operative orders.

DATED: September 23, 2026.

Respectfully submitted,

/s/ Aditya Dynar

CAMERON HALLING
Cal. Bar No. 306778
Pacific Legal Foundation
555 Capitol Mall, Ste. 1290
Sacramento, CA 95814
Tel.: (916) 419-7111
Fax: (916) 419-7747
CHalling@pacificlegal.org

ADITYA DYNAR
D.C. Bar No. 1686163
Pacific Legal Foundation
3100 Clarendon Blvd., Ste. 1000
Arlington, VA 22201
Tel.: (202) 807-4472
Fax: (916) 419-7747
ADynar@pacificlegal.org

*Counsel for Petitioners*

## Certificate of Compliance

1. This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,425 words, which is within the 11,500-word limit set by the Court, Doc. 72 (July 15, 2026).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point font in Century Schoolbook.

DATED: September 23, 2026.

/s/ Aditya Dynar
ADITYA DYNAR

## Certificate of Service

I hereby certify that on September 23, 2026, I filed the foregoing with the Court via CM/ECF. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 23, 2026.

/s/ Aditya Dynar
ADITYA DYNAR